MAIN BROTHERS OIL COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Main Bros. Oil Co. v. Commissioner
Docket No. 6862-80.
United States Tax Court
T.C. Memo 1982-279; 1982 Tax Ct. Memo LEXIS 469; 43 T.C.M. (CCH) 1426; T.C.M. (RIA) 82279; May 19, 1982. *469 Matthew H. Mataraso, for the petitioner. Bradford A. Johnson, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Chief Judge: Respondent determined a deficiency of $ 15,018.03 in petitioner's Federal income tax for the year ended June 30, 1977. The sole issue for our determination is the proportion of proceeds received by petitioner upon the sale of Peoples Gasoline and Oil which is properly allocable to a covenant not to compete. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, Main Brothers Oil Company, Inc., is a corporation with its principal place of business in Delmar, New York. Petitioner is in the business of selling home heating oil, gasoline, and kerosene in and around the Albany-Schenectady-Troy area of New York State. In 1976, petitioner decided to sell Peoples Gasoline and Oil (Peoples) located in Hoosick Falls, New York. Hoosick Falls is approximately 35 to 40 miles from Delmar and petitioner felt that this distance made Peoples difficult for petitioner to manage and, consequently, unprofitable. Petitioner entered into negotiations for the sale *470 of Peoples to Paul LaPorte. Mr. LaPorte was represented in the negotiations by a broker, Arnold Dubb. Matthew Mataraso, a member of petitioner's board of directors and petitioner's legal counsel, represented petitioner during the negotiations. Mr. Mataraso informed Mr. Dubb that petitioner wanted approximately $ 120,000 for Peoples. In a letter to Mr. Mataraso on October 26, 1976, Mr. Dubb set forth a tentative breakdown of the $ 122,000 purchase price as follows: fixed assets $ 10,000; inventory of burners, heaters, and burner parts $ 10,000; goodwill $ 20,000; and covenant not to compete $ 82,000. Several changes were made to the allocation by Mr. Mataraso, including changing the separate values assigned to goodwill and the restrictive covenant to a combined value of $ 90,000. In a letter to Mr. Mataraso dated November 3, 1976, Mr. Dubb proposed values of $ 20,000 and $ 70,000 for goodwill and the covenant, respectively. On December 10, 1976, Mr. Dubb sent Mr. LaPorte's attorney, George Holbrook, a copy of the proposed agreement drawn by Mr. Mataraso with changes made by Mr. Dubb. The agreement provided for the allocation of $ 20,000 to goodwill and $ 70,000 to the restrictive *471 covenant. The radius of the restricted area was defined as 25 miles. Petitioner and Mr. LaPorte entered into an agreement on December 16, 1976 (the agreement), pursuant to which petitioner agreed to sell and Mr. LaPorte agreed to purchase Peoples. The total purchase price was $ 142,079.90. [1] The agreement provided for an allocation of $ 20,000 of the purchase price to goodwill and $ 70,000 to a covenant not to compete. The radius of the restricted area was reduced to 15 miles. The agreement was drafted by Mr. Mataraso. The terms of the agreement were satisfactory to petitioner. William Vincent, petitioner's president and general manager, was aware that the contract contained a covenant not to compete. The tax consequences of the allocation were discussed by Mr. Mataraso with petitioner's principals. Similarly, Mr. LaPorte was aware that the agreement contained a covenant not to compete and of the tax consequences of the allocation between the covenant and goodwill. At the time he purchased *472 Peoples, Mr. LaPorte was in direct competition with petitioner in the fuel oil and gasoline business in Hoosick Falls. Absent the covenant not to compete, Mr. LaPorte would not have purchased Peoples. The negotiations for the sale of Peoples were conducted at arm's length, in a friendly atmosphere, and in good faith. Petitioner knows of no reason why the agreement would be unenforceable due to mistake, undue influence, fraud, duress, or like reason. When it sold Peoples, petitioner had no intention of competing with Mr. LaPorte in the Hoosick Falls area; it felt, at that time, that such competition could not be engaged in profitably. Nevertheless, absent the restrictive covenant, petitioner could have competed in the Hoosick Falls area. Since the expiration of the four-year covenant, petitioner has competed with Peoples for the business of two commercial customers located in the previously restricted area. On its 1977 tax return, petitioner treated the $ 90,000 allocated to the restrictive covenant and goodwill as proceeds from the sale of a capital asset for which it was entitled to long-term capital gain treatment. Respondent has determined that the $ 70,000 allocated *473 by the agreement to the restrictive covenant represents ordinary income to petitioner. OPINION The issue before us is whether a party to an agreement involving the sale of a business should be bound by the allocation made in the agreement to a covenant not to compete. Petitioner argues that the covenant not to compete is properly treated as a capital asset non-severable from the transfer of goodwill to the buyers. Respondent, on the other hand, argues that the restrictive covenant has independent significance apart from merely assuring the effective transfer of goodwill and that the allocation per the agreement should be upheld because it reflects the parties' intentions. We first look at the legal standard by which the burden of proof must be measured. Respondent urges us to adopt the rule set forth in , remanding , that "a party can challenge the tax consequences of his agreement * * * only by adducing proof which in an action between the parties to the agreement would be admissible * * * to show its unenforceability because of mistake, undue influence, fraud, duress, *474 etc." The Danielson rule has been rejected by this Court in favor of the "strong proof" rule, see e.g., , affd. sub. nom. , namely, "that when the parties to a transaction * * * have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration." , affg. . Regardless of which standard we apply, petitioner must fail. It has not supplied the strong proof necessary to overcome the allocation set forth in the agreement. See Rule 142(a). [2] A fortiori, petitioner has not met the standard established in Danielson. See , affg. a Memorandum Opinion of this Court. *475 In applying the "strong proof" standard, the courts have used two basic tests to determine whether the substantive elements of a transaction are such as to allow an allocation different from the written agreement -- the "severability" test and the "economic reality" test. See . [3] We find it unnecessary for us to probe the subtleties of these often overlapping and occasionally merging theories (see ) because we conclude that petitioner, who has the burden of proof, see Rule 142(a), has failed to carry that burden whichever test we apply. Petitioner, citing , argues that the *476 covenant not to compete merely insures the effective transfer of goodwill to the buyer and thus the covenant is a capital asset nonseverable from the goodwill. In almost every case in which a business is sold, however, a covenant not to compete insures that the buyer receives the maximum benefit of the goodwill he purchased. Cf. , affg. a Memorandum Opinion of this Court. We have not, however, held that in every such case the restrictive covenant is nonseverable and therefore subject to capital gains treatment. Rather, in determining whether the covenant is nonseverable we have looked to "whether the covenant was separately bargained for, whether it was treated in a separate and distinct manner, and whether a severable consideration for it can be shown." . The second test, the "economic reality" test, has been set forth in , affg. , *477 as follows: [T]he covenant must have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement. Regardless of which test is applied, we consider the following factors to be significant: 1.The parties contracted for a covenant not to compete and allocated $ 70,000 of the total purchase price of $ 142,079.90 to the covenant. 2. Petitioner entered into the agreement knowingly and willingly. Petitioner's president testified that he knew that $ 70,000 had been allocated to the covenant not to compete and that the agreement was satisfactory.Mr. Mataraso stated that he explained the tax consequences of the agreement to petitioner's principals. 3. The question of allocation was discussed by Mr. Dubb and Mr. Mataraso during the negotiations. Mr. Mataraso objected to any allocation and Mr. Dubb, on behalf of Mr. LaPorte, insisted on it.Both parties were obviously motivated by self-interest. The negotiations were at arm's length, friendly, and conducted in good faith. 4. The amount allocated to the covenant not to compete appears reasonable *478 in relationship to the total purchase price and the allocation to goodwill. 5.Petitioner testified that, at the time it sold Peoples, it had no intention of competing in the Hoosick Falls area because to do so would be unprofitable. Assuming arguendo that we accept petitioner's unsupported statement that competition would be unprofitable, this factor does not reduce the covenant to mere surplusage. Petitioner had the capability to compete with Mr. LaPorte and continued to operate a fuel oil, gasoline, and kerosene business in Delmar, New York. The covenant not to compete protected Mr. LaPorte against petitioner's reassessment of the profitability of operating in the Hoosick Falls area. 6. Prior to his purchase of Peoples, Mr. LaPorte was in direct competition with petitioner and knew that petitioner was highly regarded in the Hoosick Falls area; absent the covenant, he would not have purchased Peoples.In light of the business realities -- Mr. LaPorte's past competition with petitioner, his desire to enlarge his business, and the fact that petitioner remained in the same business in Delmar -- the agreement is one for which "reasonable men genuinely concerned with their economic *479 future, might bargain." See also . 7. After the expiration of the covenant, petitioner in at least two instances competed with Mr. LaPorte for commercial customers in the area previously covered by the covenant. Petitioner argues that, pursuant to the standard industry practice of valuing a business by attained gallonage, [4] we must allocate $ 90,000 of the purchase price to goodwill. The record does not contain sufficient evidence to persuade us that the attained gallonage method was used by the parties to this deal. Additionally, it appears that, contrary to petitioner's assertions, when the attained gallonage method is used, the value arrived at, in this case $ 90,000, is allocated between goodwill and a covenant not to compete. Cf. , affg. a Memorandum Opinion of this Court. Accordingly, based on the entire record and *480 the factors discussed above, petitioner has not presented the requisite strong proof to overcome the allocation of $ 70,000 to the covenant not to compete. See , affd. by other (1st Cir. July 13, 1981). Decision will be entered for the respondent.
Footnotes
1. The increase of approximately $ 20,000 above the tentative purchase price of $ 122,000 is attributable to the existence of a larger inventory than the parties had originally estimated.↩
2. Unless otherwise indicated, all references to Rules are to the Tax Court Rules of Practice and Procedure.↩
3. We note, however, that this Court has indicated a preference for the "economic reality" test. See . The "strong proof" test is sometimes articulated in terms of the intent of the parties. See , affg. a Memorandum Opinion of this Court.↩
4. Pursuant to the attained gallonage method, the number of gallons sold by the business in the most recent twelve-month period is multipled by ten cents.↩